

SO ORDERED.

SIGNED this 15 day of March, 2017.

David M. Warren
United States Bankruptcy Judge

---

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## NEW BERN DIVISION

IN RE:

**MILLS INTERNATIONAL, INC.**

     Debtor

CASE NO. 15-00976-5-DMW

CHAPTER 11

---

**MILLS INTERNATIONAL, INC.**

     Plaintiff

vs.

**ARCHIE RANDALL HOLMES and
HOLMES AGRIBIZ, INC.**

     Defendants

ADVERSARY PROCEEDING
NO. 16-00040-5-DMW

---

## MEMORANDUM OPINION AND ORDER

This matter comes on to be heard upon the Notice of Removal filed by Mills International, Inc. ("Plaintiff") on May 16, 2016. The Notice of Removal removed from the Johnston County District Court to this court a civil action ("Removed Action") captioned "Mills International, Inc.

vs. Archie Randall Holmes; Holmes Agribiz, Inc.; L&W Farms, Inc.; and E.B. Harris, Inc./Auctioneers," Case Number 12 CVD 000867. The remaining defendants are Archie Randall Holmes ("Holmes") and Holmes Agribiz, Inc. ("Holmes Agribiz"). Prior to the removal to this court, the Johnston County District Court dismissed E.B. Harris, Inc./Auctioneers ("Harris") as a party, and the parties have stipulated that L&W Farms, Inc. ("L&W")[1] is no longer a party to this action.

The court conducted a trial ("Trial") of the Removed Action in Raleigh, North Carolina on September 29, 2016. Matthew W. Buckmiller, Esq. and Joseph Z. Frost, Esq. appeared for the Plaintiff, and J.M. Cook, Esq. and Walter L. Schmidlin, Esq. appeared for Holmes and Holmes Agribiz (collectively "Defendants").

## CAUSES OF ACTION

1.      While the details of the Removed Action will be provided later, the Removed Action first began in the Johnston County District Court as an action by the Plaintiff for the return of certain tractors and equipment, or in the alternative to collect under a breach of contract by the Defendants. The Defendants counterclaimed under several causes of action including abuse of process and violations of the North Carolina Debt Collections Act ("NCDCA").

2.      The Johnston County District Court ultimately entered a judgment against the Plaintiff in the sum of $222,500.00 for substantive damages, the sum of $445,000.00 for punitive damages and the sum of $548,000.00 for damages related to the alleged continuous nature of Plaintiff's violation of the NCDCA over a 136-week time period following the initial occurrence,

---

[1] The Complaint alleges "L & W Farms, Inc." is a North Carolina corporation whose registered agent is Larry S. Ammons in Garland, North Carolina. According to Defendants' counsel, the corporation cited in the Complaint is unrelated to the "L&W Farms, Inc." associated with Holmes, and Holmes could not have formed "L&W Farms, Inc." at the time in question because the unrelated corporation with that name already existed and was registered with the North Carolina Secretary of State.

at a rate of $4,000.00 in damages per week.[2]  As explained later, the Johnson County District Court credited the Plaintiff for the $96,000.00 it previously paid and awarded a net judgment against the Plaintiff in the amount of $1,119,500.00.

3.        The Plaintiff filed a Notice of Appeal[3] of the judgment on January 29, 2015.  On April 5, 2016, the North Carolina Court of Appeals ("NCCOA") entered an unpublished Opinion finding that the Johnston County District Court correctly dismissed as a matter of law all of Plaintiff's claims except its breach of contract claim and incorrectly entered summary judgment in favor of the Defendants on their counterclaims against the Plaintiff.  The NCCOA remanded the issues of the Plaintiff's breach of contract claim and the Defendants' counterclaims to the Johnston County District Court for further proceedings consistent with the NCCOA's Opinion.  That remand prompted the removal to this court.

4.        The Plaintiff and the Defendants have stipulated the <u>remaining</u> claims and affirmative defenses as follows:

            a.        The Plaintiff asserts breach of contract against the Defendants.

            b.        The Defendants assert the following affirmative defenses (presumably to the breach of contract claim):

                        i.        Rule 12(b)(6)[4]
                        ii.       Failure to Meet Conditions Precedent

---

[2] The Johnston County District Court cited N.C. Gen. Stat. § 75-8 in its Order.  Section 75-8 states "[w]here the things prohibited in [Chapter 75] are continuous, then in such event, after the first violation of any of the provisions hereof, each week that the violation of such provision shall continue shall be a separate offense." N.C. Gen. Stat. § 75-8 (1913).  The court notes that the Johnston County District Court's award of weekly damages appears to be misguided.  Section 75-8 is meant to preclude the statute of limitations from tolling upon the first instance of an act prohibited under Chapter 75 if the defendant continuously commits subsequent violations. *See Thomas v. Petro-Wash, Inc.*, 429 F. Supp. 808, 812 (M.D.N.C. 1977) ("[W]hen a private cause of action is based upon a continuous invasion of one's rights . . . the plaintiffs' [sic] cause of action accrues from day to day as his rights are invaded to his damage."); *Richardson v. Bank of Am., N.A.*, 643 S.E.2d 410, 422 (N.C. Ct. App. 2007) ("N.C.G.S. § 75-8 extend[s] the statute of limitations for continuing violations . . . ." (citation omitted)).

[3] The Notice of Appeal also gave notice of Plaintiff's appeal of other, prior orders entered by the Johnston County District Court.

[4] A motion to dismiss under Rule 12(b)(6) is a pre-trial motion and not usually considered as an affirmative defense.

       iii.      Estoppel
       iv.     Payment
       v.      Statute of Frauds
       vi.     Statute of Limitations
       vii.    Waiver
       viii.   Duress

c.     The Defendants assert the following counterclaims against the Plaintiff:

       i.      Abuse of Process
       ii.     Conversion
       iii.    NC Debt Collections Violation

d.     The Plaintiff asserts the following affirmative defenses to the Defendants'

counterclaims:

       i.      Rule 12(b)(6)
       ii.     No Process Served on Defendants
       iii.    Noerr-Pennington Doctrine
       iv.    First Amendment
       v.      Accord and Satisfaction
       vi.     Release & Waiver
       vii.    Reaffirmation of the Debt

5.     At the Trial, the Plaintiff presented the testimony of the following individuals:[5]

a.     David G. Mills ("Mills"), Secretary-Treasurer of the Plaintiff;

b.     Deputy Robert Broughton ("Deputy Broughton") of the Johnston County

Sheriff's Department; and

c.     Wendy Langston ("Ms. Langston"), a Deposit Operations Manager and

record custodian with KS Bank during the time period relevant to this case.

6.     Holmes testified for the Defendants.

7.     The Plaintiff introduced 44 exhibits that the court admitted into evidence.  The

Defendants introduced three exhibits that the court admitted into evidence.

---

[5] The parties agreed prior to the Trial to call each witness to testify only once, and as a result, on cross-examination counsel for the Defendants was permitted to go beyond the scope of the Plaintiff's direct examination of its witnesses and vice versa.

8. At the conclusion of the Trial, the court took the matter under advisement. This Opinion sets forth the court's findings of fact and conclusions of law after considering the evidentiary testimony and exhibits in concert with the record of the Removed Action and the arguments of counsel at the Trial.

## FINDINGS OF FACT[6]

### The Parties

9. The Plaintiff owns and operates a farming and outdoor equipment dealership located in Kinston, Lenoir County, North Carolina.

10. Holmes Agribiz was formed as a North Carolina Corporation on March 19, 2002, and Holmes has represented himself to be the president of Holmes Agribiz on documents filed with the North Carolina Secretary of State.[7]

### Initial Agreement Between Plaintiff and Defendants

11. On March 30, 2006, Holmes met with Mills regarding the purchase of the following tractors and farm equipment for a total purchase price of $222,500.00:[8]

    a.    One Case IH MXM190 tractor for a purchase price of $81,500.00;
    b.    One Case IH MXM120 tractor for a purchase price of $62,500.00;
    c.    One Case IH MXM130 tractor for a purchase price of $52,000.00;
    d.    One Case IH RMX340 disk harrow for a purchase price of $20,000.00; and
    e.    One Unverferth STP 12-4 field cultivator for a purchase price of $6,500.00.

---

[6] There are multiple disputed material facts at issue in this case. Where appropriate and relevant, the court will identify any conflicting assertions when it makes its findings of fact and conclusions of law.

[7] Holmes testified that his late wife was president of Holmes Agribiz; however, the exhibits admitted by the court indicate that Holmes considered himself president of Holmes Agribiz. To the extent Holmes Agribiz's corporate charter was suspended at the time it filed its counterclaims, as is alleged by the Plaintiff in the Plaintiff's Trial Brief filed with this court on September 28, 2016, the court finds Holmes Agribiz had authority to defend itself and file counterclaims despite any suspension of charter. "[W]hile depriving the corporation of the power to engage in the ordinary business for which it has been chartered, [the suspension] has not taken away from it the incidental powers necessary to its survival; the power to protect its property in a court of law, either by assertion or defense of right." *Raleigh Swimming Pool Co. v. Wake Forest Country Club*, 182 S.E.2d 273, 274 (N.C. Ct. App. 1971) (quoting *Ionic Lodge, F. & A. A. M. v. Ionic Lodge F. A. & A. Masons*, 59 S.E. 2d 829, 834 (N.C. 1950) (*rev'd on other grounds*)).

[8] This amount will reappear later as the facts are developed herein.

12.     The parties' original intent was for Holmes Agribiz to purchase the disk harrow and field cultivator ("Equipment") for $26,500.00 in cash and for Holmes Agribiz to obtain financing from CNH Capital ("CNH") for the purchase of the three tractors ("Tractors").  On March 30, 2006, Holmes gave a check ("Equipment Check") payable to the Plaintiff in the amount of $26,500.00 drawn on a Ranholm Investments LLC bank account ("Ranholm Account") with KS Bank.

13.     In connection with the purchase of the Tractors, Holmes signed three undated Retail Order Forms on which Mills wrote only the total purchase price for each of the Tractors and in the "Schedule of Instalments" wrote in the advance payment amount for each of the Tractors.  No other installment payments were listed on the Retail Order Forms for the Tractors.  The Retail Order Forms for the Tractors did not contain any reference to Holmes Agribiz.

14.     Holmes signed a credit application ("Credit Application") dated March 30, 2006 on behalf of Holmes Agribiz that included Holmes Agribiz's business information but did not include any information regarding the items to be purchased or the purchase price.  The Credit Application was then triplicated to create a Credit Application for each of the Tractors, but the Plaintiff failed to add additional sale terms to those forms after they were copied.[9]

15.     Holmes also executed a Streamlined Sales Tax Agreement Certificate of Exemption in his capacity as President of Holmes Agribiz on March 30, 2006, although the Certificate of Exemption did not indicate Holmes Agribiz's type of business or reason for exemption.

16.     On March 31, 2006, Mills submitted to CNH through an online process the three Credit Applications that contemplated a combined down payment of $50,000.00 for the Tractors,

---

[9] All three Credit Applications submitted as Exhibits 19, 21 and 23 appear to be identical, except it appears the "Exact Business Name" was changed from "Holmes Agribusiness Inc." to "Holmes Agribiz, Inc." after the wet ink Credit Application was copied.

leaving $146,000.00 to be financed at a 4.9% interest rate with five yearly payments due on April 1st of 2007 through 2011. The proposed yearly payment amounts were calculated based on the final payment being 10% of the purchase price of each Tractor. The contemplated payment terms ("CNH Terms") for the Tractors were as follows:

| Terms and Payment | Case IH MXM190 | Case IH MXM120 | Case IH MXM130 |
| --- | --- | --- | --- |
| Purchase price | $81,500.00 | $62,500.00 | $52,000.00 |
| Down payment | $23,000.00 | $14,500.00 | $12,500.00 |
| April 1, 2007 | $14,660.28 | $12,125.46 | $ 9,965.71 |
| April 1, 2008 | $14,660.28 | $12,125.46 | $ 9,965.71 |
| April 1, 2009 | $14,660.28 | $12,125.46 | $ 9,965.71 |
| April 1, 2010 | $14,660.28 | $12,125.46 | $ 9,965.71 |
| April 1, 2011 | $ 8,150.00 | $ 6,250.00 | $ 5,200.00 |

17.    On March 31, 2006, CNH declined all three Credit Applications related to the Tractors.

### First Amended Agreement Between Plaintiff and Defendants

18.    After the denial of the CNH Credit Applications, Mills and Holmes agreed[10] that the Plaintiff would finance the purchase of the Tractors under the CNH Terms. In support of the amended agreement, Holmes executed three checks ("Tractor Checks") totaling $96,000.00 and payable to the Plaintiff drawn on the Holmes Agribiz account with KS Bank. The checks dated March 31, 2006 in the amounts of $45,000.00, $28,000.00 and $23,000.00[11] were advance payments for the Case IH MXM190, Case IH MXM120 and Case IH MXM130, respectively.

19.    The Plaintiff deposited the Tractor Checks and the Equipment Check into the Plaintiff's bank account on April 3, 2006 and April 4, 2006, respectively. KS Bank failed to honor

---

[10] Holmes testified at the Trial that he never knew the Credit Applications were denied. The credibility of this position is contradicted by the fact Holmes executed the Tractor Checks, discussed *infra*, in favor of the Plaintiff, not CNH.

[11] The Tractor Checks totaled $96,000.00, whereas the total down payment under the CNH Terms was only $50,000.00. At the Trial, Mills testified that the Plaintiff financed the same amount as was contemplated under the CNH terms, but the evidence shows that recollection is incorrect. The difference in down payment amounts would be consistent with the Plaintiff requiring a larger down payment upon deciding to owner-finance the Tractors.

any of the checks.  KS Bank returned the Tractor Checks to the Plaintiff with a notation that the Holmes Agribiz account had been closed.  KS Bank returned the Equipment Check to the Plaintiff for insufficient funds in the Ranholm Account.[12]

<u>Second Amended Agreement Between Plaintiff and Defendants</u>

20.     To remedy the dishonoring of the Tractor Checks and the Equipment Check, Holmes, on April 13, 2006, obtained a cashier's check from KS Bank payable to the Plaintiff in the amount of $96,000.00 ("Down Payment").  This amount equals the total of the dishonored Tractor Checks.  Mills testified that the Down Payment was applied to the Tractors, and for the purposes of this Order, the court will assume the Plaintiff allocated the Down Payment to the Tractors.[13]

21.     Mills and Holmes agreed that the Plaintiff would finance the purchase of the Equipment under the same terms as the financing of the Tractors, meaning at an interest rate of 4.9% with payments to be made over the course of five years ending on April 1, 2011 ("Second Amended Agreement").

22.     A payment schedule for the purchase of the Tractors reflecting the amended down payment amounts (as opposed to the down payments under the CNH Terms) was never reduced to writing.  Likewise, the parties never created a written payment schedule for the purchase of the Equipment.  Applying the interest rate and payment schedule of the CNH Terms to the agreement between the Plaintiff and Holmes Agribiz, the resulting payment schedule bound the parties as follows:

---

[12] Holmes testified at the Trial that he told Mills not to deposit immediately the Tractor Checks and the Equipment Check, as they were meant solely to place a hold on the Tractors and Equipment.  The reason the checks were not honored is of little relevance to the claims between the parties.  To the extent the court finds Holmes' testimony to be incredible, that finding does not relate to the issue of the checks being dishonored by KS Bank.

[13] The Retail Order Forms for the Equipment are signed and dated April 13, 2006, and one is marked paid. This documentation is inconsistent with Mills' testimony that the Plaintiff financed the Equipment purchase without a down payment.

| Terms and Payment | Case IH MXM190 | Case IH MXM120 | Case IH MXM130 | Equipment |
|---|---|---|---|---|
| Purchase price | $81,500.00 | $62,500.00 | $52,000.00 | $26,500.00 |
| Down payment | $45,000.00 | $28,000.00 | $23,000.00 | N/A |
| Financed Amount | $36,500.00 | $34,500.00 | $29,000.00 | $26,500.00 |
| April 1, 2007 | $8,375.82 | $8,254.59 | $6,951.09 | $6,840.21 |
| April 1, 2008 | $8,375.82 | $8,254.59 | $6,951.09 | $6,840.21 |
| April 1, 2009 | $8,375.82 | $8,254.59 | $6,951.09 | $6,840.21 |
| April 1, 2010 | $8,375.82 | $8,254.59 | $6,951.09 | $6,840.21 |
| April 1, 2011 | $8,150.01 | $6,250.00 | $5,200.02 | $2,650.01 |

23.     The Plaintiff ordered the Tractors and Equipment in its own name.  The Plaintiff delivered to Holmes Agribiz, and Holmes Agribiz accepted,[14] the Equipment and Tractors in two deliveries on April 18, 2006 and April 21, 2006.  Holmes and Holmes Agribiz did not execute a promissory note or security agreement granting the Plaintiff a lien upon the Tractors and Equipment.  The Plaintiff and the Defendants have not produced a bill of sale, nor have they ever mentioned that one existed, but when asked whether the property was sold to Holmes and Holmes Agribiz, Mills testified it was "sold and registered in his [Holmes'] name."  The greater weight of the evidence indicates that Holmes Agribiz, rather than Holmes individually, was the purchaser of the Tractors and Equipment and owned the Tractors and Equipment upon acceptance of the deliveries from the Plaintiff.

24.     The Plaintiff did not receive any payment from Holmes, Holmes Agribiz or any affiliated company after receiving the $96,000.00 Down Payment.  Mills contacted Holmes "five to ten times" over the following six years but never declared the debt to be in default.

<u>Six Years Later and the Beginning of the Removed Action</u>

25.     Sometime in early 2012, Mills was told by a customer that a tractor of the type Holmes Agribiz had purchased was being auctioned.  After the customer provided Mills with the

---

[14] The Delivery and Pickup Order dated April 18, 2006 identifies the purchasing party as "Holmes Agribiz Inc." and the Delivery and Pickup Order dated April 21, 2006 identifies the purchasing party as "Randle [sic] Holmes Agribiz Inc."

serial number of the tractor listed for auction, Mills realized the tractor of which the customer was speaking was one of the Tractors the Plaintiff sold to Holmes Agribiz. Mills searched online and located a listing of items to be auctioned by Harris, including the Tractors and Equipment, which were to be sold by "L&W Farms Inc. & Others" on Saturday, March 17, 2012. Below the list of items to be auctioned, including the Tractors and Equipment, was an "Auctioneer's Note" stating that "L&W Farms Inc. is having a complete dispersal of their [sic] equipment due to health issues." According to Holmes, L&W was an entity owned by his daughters, although as noted above, there appears to be an unrelated corporation with that name already in existence.

26.   On Friday, March 16, 2012, at 12:20 p.m., the Plaintiff filed a Complaint ("Complaint") in the Johnston County District Court against the Defendants, L&W and Harris seeking, *inter alia*, an Order of Attachment as to the Tractors and Equipment and a temporary restraining order and preliminary injunction prohibiting the defendants in the Removed Action from disposing of the Tractors and Equipment.

27.   The Complaint stated that the Plaintiff was the legal owner of the Tractors and Equipment, the Plaintiff had not transferred the Tractors and Equipment to the Defendants and the Defendants had not purchased the Tractors and Equipment from the Plaintiff. The Complaint further asserted that "Plaintiff has requested the return of said property and the Plaintiff has not reacquired ownership of the same, and has requested [Holmes and Holmes Agribiz] to purchase the items and has not received payment" and that the "Defendants have unlawfully failed to return the property and/or purchase the same, and without authorization of the Plaintiff, has [sic] assumed and exercised the right of possession over the property to the exclusion of Plaintiff's superior rights to the Plaintiff's detriment." The Complaint specifically alleged that "no funds [had] been received by Plaintiff" for the Tractors and Equipment. As an alternative claim for relief, the Plaintiff alleged

the Defendants were in breach of the contract "for the order, purchase, sale and financing" of the Tractors and Equipment.

28.    Filed with the Complaint were a sworn Verification by Mills that the allegations contained in the Complaint were "true to his own knowledge" and an Affidavit in Attachment Proceeding whereby Mills swore the Defendants owed him $222,500.00.[15]

29.    On March 16, 2012 at 12:39 p.m., the Johnston County District Court issued a Temporary Restraining Order ("TRO") prohibiting the defendants in the Removed Action from disposing of the Tractors and Equipment in any manner.  The TRO required the Plaintiff to post a $250.00 bond with the Johnston County Clerk of Superior Court.[16]

30.    On March 16, 2012 at 1:13 p.m., the Johnston County Clerk of Superior Court[17] issued an Order of Attachment commanding the Johnston County Sheriff "to attach and keep safely as much of the property of the defendant within [Johnston County] which is subject to attachment, as is sufficient to satisfy the amount sought in the Affidavit in Attachment Proceeding, the costs of the action and expenses."

31.    Upon obtaining the TRO and Order of Attachment and contacting the Johnston County Sheriff's Department, Mills, two employees of the Plaintiff and two Sheriff's deputies, including Deputy Broughton, went to Holmes' property where the auction was to be held.  When Deputy Broughton arrived on Holmes' property, he found twenty to thirty potential bidders inspecting the items scheduled for auction the next day.

---

[15] As mentioned earlier, this amount is relevant because it is the same amount as the initial sales price of the Tractors and Equipment without any credit for the Down Payment and no accrual of interest at the 4.9% rate.

[16] While the Removed Action was originally filed in the district court, the clerk of the superior court maintains the receipts and disbursements for the superior, district and magistrate courts.

[17] Likewise, the clerk of superior court has the authority by statute to issue claim and delivery orders and orders of attachment.

<u>Payment by the Defendants the Day Before the Auction</u>

32.     According to Deputy Broughton, Holmes asserted he did not owe the Plaintiff $222,500.00 but eventually acknowledged that he owed some amount to the Plaintiff because he had not paid the full purchase price for the Tractors and Equipment.  Harris expressed concern that the auction would not be successful, and that Harris would be liable for false advertising if the Tractors were not included in the items sold the following day.  Harris paid to the Plaintiff, and the Plaintiff deposited at 5:06 p.m. on March 16, 2012, a cashier's check for $222,500.00,[18] the entire amount listed in the Affidavit in Attachment Proceeding, with the understanding that Harris would be entitled to the proceeds from the Tractors and Equipment up to the amount of $222,500.00 as reimbursement.

33.     At the time that Harris agreed to pay to the Plaintiff $222,500.00, Holmes stated that he was going to sue the Plaintiff.  In exchange for having Holmes sign a statement that he would not sue the Plaintiff, the Plaintiff offered not to execute the Order of Attachment.  Holmes refused that offer.  An affidavit prepared by Plaintiff's state court counsel and signed by Deputy Broughton states that "[t]he Defendants offered, and [Mills] agreed to accept the amount of $222,500.00 in full satisfaction of [the Plaintiff's] claims and in exchange, [Plaintiff] recalling service of the pleadings and orders, and waiving any interest, costs and attorney fees."

34.     Upon payment by Harris to the Plaintiff, counsel at that time for the Plaintiff requested from Deputy Broughton that service of the Complaint, TRO and Order of Attachment be recalled. The Complaint, TRO and Order of Attachment subsequently were returned to the

---

[18] In the Motion to Dismiss, Answer & Counterclaim filed by the Defendants and L&W on April 17, 2012 in the Removed Action, the Defendants and L&W assert Harris paid to the Plaintiff $225,000.00; however, the Cashier's Check from Harris to the Plaintiff, admitted as Exhibit 43 at the Trial, shows Harris paid to the Plaintiff $222,500.00.

Johnston County Clerk of Court without certification of service of process, but the Plaintiff did not dismiss the Complaint.

Continuing Litigation in State Court Prior to Removal

35.     On April 17, 2012, the Defendants[19] filed a Motion to Dismiss, Answer & Counterclaim ("MTD and Counterclaim"), arguing the Complaint failed to state a claim upon which relief could be granted and asserting the following counterclaims against the Plaintiff: abuse of process; conversion; and violations of the NCDCA.  The Defendants also asserted the following affirmative defenses to the Plaintiff's breach of contract claim: failure to meet conditions precedent; estoppel; payment; statute of frauds; statute of limitations; waiver; and duress.

36.     The Plaintiff filed a Motion to Dismiss and Reply to Defendants' Counterclaims ("Reply") on June 7, 2012.  In the Reply, the Plaintiff sought dismissal of the claims asserted in the MTD and Counterclaim and raised the following affirmative defenses to those claims: no process served on the Defendants; Noerr-Pennington Doctrine; First Amendment; accord and satisfaction;[20] release and waiver; and reaffirmation of the debt.

37.     Immediately after filing the Reply, the Plaintiff filed a Motion to File Supplemental Pleading, requesting that it be allowed to file a Supplemental Pleading, a draft of which was attached to the Motion.  The proposed Supplemental Pleading asserted additional causes of action against the Defendants, L&W and Harris[21] relating to the alleged breach of the agreement reached on March 16, 2012, whereby Harris paid to the Plaintiff $222,500.00 and the Plaintiff allegedly

---

[19] The Defendants and L&W filed this pleading.

[20] The Plaintiff also asserted "attempt to settle" as an affirmative defense to the abuse of process claim, but during the final pre-trial conference held by this court on September 22, 2016, the court ordered the Plaintiff to withdraw any reference to an "attempt to settle," noting that any affirmative defense relating to the payment from Harris to the Plaintiff for alleged amounts owed could be asserted through the accord and satisfaction defense that was also included in the Reply.  To the extent the "attempt to settle" defense is relevant to the Defendants' abuse of process claim, the court will address that argument below.

[21] L&W and Harris were still parties and had not been dismissed.

agreed to recall service of the Complaint, TRO and Order of Attachment. The Plaintiff filed a subsequent Motion to Amend Complaint, Motion to Dismiss & Reply and Supplemental Pleading on October 24, 2012, requesting leave to file an Amended Complaint, Amended Motion to Dismiss and Reply to Defendants' Counterclaims and an Amended Supplemental Pleading, proposed drafts of which were attached to the Motion. The proposed Amended Complaint acknowledged for the first time in the Removed Action pleadings that Holmes paid to the Plaintiff $96,000.00 on April 13, 2006.

38.    On February 18, 2013, the Johnston County District Court entered an Order ("February 18, 2013 Order") denying the Plaintiff's Motions to file supplemental pleadings, finding that "with the Plaintiff in possession of all funds sought in the original Complaint, and even excess funds, supplementation . . . would be futile." By that same Order, the Johnston County District Court denied the Plaintiff's motion to dismiss contained in the Reply and dismissed all claims against Harris. The Order required the Plaintiff to provide to Mr. Schmidlin "a check drawn upon the trust account of [Plaintiff's] counsel" in the amount of $96,000.00, representing the "excess amount paid" to the Plaintiff. The Plaintiff paid to the Defendants $96,000.00 on February 20, 2013.[22]

39.    On July 1, 2013, the Defendants and L&W filed a Motion for Summary Judgment both as to the Plaintiff's claims against them and their counterclaims against the Plaintiff. An accompanying Brief in Support of Defendants' Motion for Summary Judgment was filed on August 8, 2013.

---

[22] The parties provided no evidence of when the Plaintiff remitted $96,000.00 to the Defendants. At the Trial, counsel for the Defendants stated that the Plaintiff paid $96,000.00 to the Defendants on February 20, 2013. The Plaintiff did not contradict that assertion.

40.    On August 7, 2013, Holmes filed with the Johnston County District Court an affidavit stating that he entered into a contract to purchase the Tractors and Equipment "on or before 30 March 2006" and that, in addition to paying to the Plaintiff $96,000.00 on April 13, 2006, he paid "approximately . . . $100,000.00 . . . in cash to Plaintiff in or around May, 2006."

41.    The Plaintiff filed a Plaintiff's Brief in Opposition of Summary Judgment on August 20, 2013.

42.    On November 6, 2013, the Johnston County District Court entered an Order Allowing Defendants' Motion for Summary Judgment ("Summary Judgment Order")[23] finding that "Defendants' Motion for Summary Judgment as to its defense of Statute of Limitations against Plaintiff is allowed . . . ."  The Johnston County District Court ordered that the Plaintiff return funds paid and damages totaling $126,500.00, plus interest until paid in full and the costs of the action.

43.    The Plaintiff filed a Motion to Correct Judgment Under Rule 60 on June 19, 2014, asserting the Summary Judgment Order mistakenly failed to reflect that it disposed of all claims between the parties consistent with the Johnston County District Court's ruling in open court on October 21, 2013 stating that it was disposing of all claims between the parties.

44.    On November 25, 2014, the Johnston County District Court entered an Order Allowing Defendants' Motion for Summary Judgment as to Defendants' Counterclaims. ("Amended Summary Judgment Order").  The Amended Summary Judgment Order awarded the $1,119,500.00 judgment against the Plaintiff, discussed *supra*, which the NCCOA reversed.

45.    The Plaintiff filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on February 20, 2015.

---

[23] The Plaintiff filed a Notice of Appeal to the NCCOA of the February 18, 2013 Order and the Summary Judgment Order on December 6, 2013.  The Plaintiff's appeal was dismissed as interlocutory on June 13, 2014.

<u>Holmes' Testimony, the Bag of Money and the Burned Receipt</u>

46.     At the Trial before this court, Holmes testified that he knew payments would be due each April, but that he was never informed by the Plaintiff that his credit application with CNH was denied.  Holmes thought he was paying CNH when he remitted the Down Payment to the Plaintiff.  Holmes testified that the interest rate he thought he would be paying was 4.1% "or something like that."

47.     Holmes testified that he paid the balance due on the Tractors and Equipment sometime in April, 2007 after his wife died, and after he received her life insurance proceeds.  This timeframe is inconsistent with the August 7, 2013 affidavit Holmes filed in the Removed Action that alleges he paid to the Plaintiff approximately $100,000.00 "in or around May, 2006." According to Holmes' testimony, he got "one or two" checks from Southern Farm Bureau Life Insurance Company ("Farm Bureau") totaling around $120,000.00 or $130,000.00 and took a check to be held – but not deposited – by KS Bank until the check cleared, and Holmes could be given cash in the amount of the check.  Holmes testified that he remitted to the Plaintiff "somewhere around" $115,000.00 to $125,000.00 in cash in a bag for payment in full of the Tractors and Equipment and received a written receipt, which he later burned.

48.     The Ranholm Account records produced at the Trial show that on May 10, 2007, Holmes deposited a check ("Insurance Check") from Farm Bureau to Holmes in the amount of $106,950.34, increasing the balance in the Ranholm Account to $113,709.66.  Holmes could not produce records of a check made payable to the Plaintiff or of a check in a large amount payable to "cash" in the weeks following the deposit of the Insurance Check.  Rather, the Ranholm Account records show that after Holmes deposited the Insurance Check into the Ranholm Account at KS Bank, Laura Holmes wrote a check in the amount of $9,317.96 in favor of Parrish Funeral Home

16

on May 17, 2007, Holmes wrote a check in the amount of $54,550.00 to Carolina Tractors, Inc. on May 18, 2007 and KS Bank issued a cashier's check from the Ranholm Account in the amount of $16,005.00[24] on May 18, 2007. Holmes and Laura Holmes executed other smaller checks, and Laura Holmes made additional withdrawals from the Ranholm Account in the month of May, 2007. By May 22, 2007, the Ranholm Account at KS Bank had a balance of $28,497.84.

49.     Ms. Langston testified that during the time period beginning March, 2006 and ending in May, 2007, the Ranholm Account was the only open account at KS Bank associated with Holmes. During that time period, there were two deposits into the Ranholm Account in an amount greater than $100,000.00. The first was a loan in the amount of $150,000.00 from KS Bank to Ranholm in April, 2006, and the second was the Insurance Check. Ms. Langston stated that if Holmes cashed, rather than deposited, a check with KS Bank from March, 2006 through May, 2007, that transaction would not appear in the records provided in the Plaintiff's exhibit. Holmes has not provided to the court any record that would reflect such a transaction.

50.     Holmes testified that in his estimation, as allegedly confirmed by Harris, the auction sales were approximately $90,000.00 lower than expected. Holmes presumably believes the proceeds were lower because potential buyers saw the Johnston County Sheriff's Deputies on his property the day before the auction and decided to bid less for the items or not to attend the auction.

## DISCUSSION

### Jurisdiction

51.     The parties have stipulated that the court has jurisdiction over the parties and the subject matter before the court pursuant to 28 U.S.C. §§ 151, 157, and 1334 and that the court has

---

[24] The bank records indicate that "Laura" requested the cashier's check "by phone."

the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

52.     The claims asserted by the parties in the Removed Action are rooted in North Carolina statutory and common law and are non-core matters; however, the court has "related to" jurisdiction of the Removed Action because the disposition of the claims between the parties will undoubtedly affect the Plaintiff's bankruptcy estate.  To determine the presence of "related to" jurisdiction, the Fourth Circuit "has adopted the test articulated by the Third Circuit in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) . . . ." *Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 836 (4th Cir. 2007).  "[T]he test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*." *Id.* (quoting *Owens-Ill., Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124 F.3d 619, 625 (4th Cir. 1997) and *Pacor*, 743 F.2d at 994) (emphasis in original).

### Plaintiff's Breach of Contract Claim Against the Defendants

53.     Under North Carolina law, the party asserting a breach of contract claim must show "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000).  "The essence of any contract is the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds. This mutual assent and the effectuation of the parties' intent is normally accomplished through the mechanism of offer and acceptance." *Snyder v. Freeman*, 266 S.E.2d 593, 602 (N.C. 1980) (citing *Pike v. Wachovia Bank & Trust Co.*, 161 S.E. 2d 453 (N.C. 1968)). "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." *Id.*

54.     The parties clearly disagree at this time as to whether there was a meeting of the minds on the terms of the sale of the Tractors and Equipment. "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." N.C. Gen. Stat. § 25-2-204(3) (1965). As the Official Comment to N.C. Gen. Stat. § 25-2-204 states, "the fact that one or more terms are left to be agreed upon [is not] enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of "indefiniteness" are intended to be applied . . . ." N.C. Gen. Stat. § 25-2-204. Even though the documentation was almost non-existent, the testimony about the evolving and final terms of sale of the Tractors and Equipment allows for the conclusion that as of April, 2006, the Tractors and Equipment would be purchased over the course of five years, with payments each April based on a residual payment in April, 2011 of 10% of the purchase price.

55.     This conclusion is supported by the evolving agreement. The parties had a meeting of the minds on three separate occasions. Holmes admitted that he knew installments were to be paid each April but asserted he was never told that CNH denied his credit application. That assertion is inconsistent with Holmes writing the Down Payment check to the Plaintiff and increasing the Down Payment amount from $50,000.00 to $96,000.00. The Plaintiff offered, and the Defendants accepted, for the Plaintiff to provide financing after CNH declined the credit.

56.     This "dealer-financing" does not appear to be a common form of agreement entered into by the Plaintiff and its customers. The Defendants showed at the Trial that the accounts receivable listed on the Plaintiff's Schedule B (schedule of personal property assets) do not include any other sales financed by the Plaintiff; however, the more credible testimony is that of the Plaintiff as it relates to the financing by the Plaintiff of the purchase of the goods by the Defendants

under the CNH Terms (4.9% over five years).  While the debtor-creditor relationship between the Defendants and the Plaintiff evades precise definition, it appears to be an unsecured account receivable to be paid in annual installments.  The NCCOA made a good attempt at describing the debtor-creditor relationship as follows:

> [T]he UCC's provisions concerning the passing of title apply to the farm equipment here. Pursuant to N.C. Gen. Stat. § 25-2-401, '[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.' N.C. Gen. Stat. § 25-2-401(1) (2015). It is undisputed that Plaintiff never filed any documentation to reserve a security interest in the equipment. N.C. Gen. Stat. § 25-2-401 further provides that '[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place.' N.C. Gen. Stat. § 25-2-401(2).
>
> Here, neither party asserts that there was an explicit agreement otherwise providing for the passing of title to the farm equipment. Therefore, because the uncontroverted evidence shows that Plaintiff delivered the equipment to Defendants in April 2006 and did not reserve a security interest in the equipment, Plaintiff had no ownership interest or immediate right of possession in the farm equipment when it filed its complaint in 2012.

*Mills International, Inc. v. Holmes et. al*, No. COA15-720, slip op. at 13-14 (N.C. Ct. App. Apr. 5, 2016).  That analysis is supported by Mills' testimony that the Tractors and Equipment were "sold and registered in [Holmes'] name."

57.     The Defendants did not pay the Plaintiff for almost six years.  The Defendants' assertion that Holmes paid over $100,000.00 in a bag of money lacks credibility and corroboration and will be deemed not to have occurred.  Through the exhibits the court examined the shoddy business practices of the Plaintiff and is not surprised that it failed to pursue payment on the obligation of Holmes Agribiz.  The Plaintiff's lack of documentation and the poor accounting practices were an incubator for this exact type of dispute the court is faced with resolving today. The Plaintiff's rudimentary business practices harken back to the early days of the Eastern North

Carolina rural agriculture merchant who documented customers' debts in the spiral notebook kept in his front shirt pocket.  The only difference is that back then, most merchants were fastidious about monitoring payment, even if those payments were once a year.

58.     During the almost six years of non-payment, the Plaintiff could have, but did not, declare a default under the Second Amended Agreement. It was only after the Defendants were ready to sell the Tractors and Equipment did Mills wake up and realize that he had a problem with this credit.  If the $126,500.00 that was financed by the Plaintiff accrued interest at 4.9% for 71 months from April, 2006 until March, 2012, the Plaintiff would have been owed approximately $163,249.00 on the day before the auction; however, the court is unwilling to award such sloppy business practices and lackadaisical collection efforts with interest accrual beyond what was contemplated in the Second Amended Agreement.   The missed installment payments total $143,936.88 as of March 16, 2012, subject to the Defendants' affirmative defenses as analyzed below.  Before addressing those affirmative defenses, though, the court will focus next on the judicial action taken by the Plaintiff to collect the debt.

<u>The Judicial Action Taken by the Plaintiff and<br>Defendants' Abuse of Process Counterclaim Against the Plaintiff</u>

*Order of Attachment was Justified*

59.     If the Plaintiff had not included false information in the Complaint and Affidavit in Attachment Proceeding and instead asserted accurately the basis and amount of its claim, the Plaintiff still would have been able to establish the grounds for attachment stated in N.C. Gen. Stat. § 1-440.3.  The Complaint sought, in part, a judgment for money, and the Plaintiff had sufficient cause to believe and assert that Holmes Agribiz, "with intent to defraud . . . its creditors . . . [was] about to assign, dispose of, or secrete, property." N.C. Gen. Stat. § 1-440.3(5) (1947); *see* N.C. Gen. Stat. § 1-440.2 (1967).  Moreover, N.C. Gen. Stat. § 1-440.11 permits the amendment of an

affidavit for attachment at any time before judgment is entered, and attachment bonds[25] are required for the very reason that a plaintiff does not always assert accurately the amount owed. N.C. Gen. Stat. § 1-440.11(c) (1947).

### Compliance with Rule 65 in Obtaining the TRO

60.    A court may only grant a temporary restraining order without notice to the affected party if "the applicant's attorney certifies to the court in writing the efforts, if any, that have been made to give the notice and the reasons supporting the claim that notice should not be required." N.C. Gen. Stat. § 1A-1, Rule 65 (2001). The record of the Removed Action does not appear to include any certification by the Plaintiff's state court counsel in compliance with Rule 65 of the North Carolina Rules of Civil Procedure, and it appears the issuance of the TRO may not have been warranted. For purposes of this Opinion, though, the court will assume the Johnston County District Court followed the requirements of Rule 65 before issuing the TRO.

### Abuse of Process Using the Order of Attachment and TRO

61.    Although the Plaintiff legitimately obtained the Order of Attachment and TRO, the court is not precluded from finding the Plaintiff subsequently committed abuse of process. As a threshold issue, the Plaintiff argues that it cannot be liable for abuse of process because process was never served on the Defendants. The Plaintiff has classified this argument as an affirmative defense, although that classification is, by definition, an impossibility.[26] Whether the Order of Attachment and TRO were actually *served* on the Defendants has no bearing on whether Plaintiff may be liable for abuse of process. By obtaining the Order of Attachment and TRO and informing

---

[25] It is unclear whether the Plaintiff posted a bond for the Order of Attachment because the record of the Removed Action includes a blank attachment bond form. The Order of Attachment has "$250.00" written in the section in which the "Amount Sufficient to Satisfy Plaintiff's Demand" is supposed to be written, so the bond amount may have been entered there mistakenly. The TRO required the Plaintiff to post a $250.00 bond. The court notes that the $250.00 bond required by the Johnston County District Court was woefully inadequate for a complaint seeking $222,500.00 and an ancillary action when the Plaintiff had no security interest in the targeted assets.

[26] In asserting an affirmative defense, a defendant affirms an act occurred but offers a defense to culpability.

the Defendants of their existence, the Plaintiff took sufficient steps employing and executing process to be liable for abuse of process if the elements are met.

62.     "Abuse of process is the misapplication of civil or criminal process to accomplish some purpose not warranted or commanded by the process." *Pinewood Homes, Inc. v. Harris*, 646 S.E.2d 826, 831 (N.C. Ct. App. 2007) (citation omitted).  A claimant alleging abuse of process must prove two elements:

> (1) that the defendant had an ulterior motive to achieve a collateral purpose not within the normal scope of the process used, and (2) that the defendant committed some act that is a 'malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ.'

*Id.* (quoting *Stanback v. Stanback*, 254 S.E.2d 611, 624 (N.C. 1979) (emphasis in original) (citation omitted)).  The *Stanbeck* court addressed the elements of an abuse of process claim in the context of a motion to dismiss, finding

> [t]he ulterior motive requirement is satisfied when the plaintiff alleges that the prior action was initiated by defendant or used by him to achieve a collateral purpose not within the normal scope of the process used. The act requirement is satisfied when the plaintiff alleges that once the prior proceeding was initiated, the defendant committed some wilful act whereby he sought to use the existence of the proceeding to gain advantage of the plaintiff in respect to some collateral matter.

*Stanback*, 254 S.E.2d at 624 (citing *Edwards v. Jenkins*, 101 S.E. 2d 410 (N.C. 1957)).

63.     The Plaintiff clearly did not want the sale of the Tractors and Equipment to occur, and the use of the Order of Attachment and TRO to secure the Tractors and Equipment from being sold would have been proper, despite the inaccuracies in the Complaint; however, the Plaintiff went *beyond* the scope of the Order of Attachment and TRO by seeking payment of $222,500.00 in exchange for Plaintiff recalling service of the pleadings.  Mills testified at the Trial that "we wanted our money, or the Sheriff was going to hold up that equipment from being sold."  The Order of Attachment and TRO were meant to put the Tractors and Equipment in the Sheriff's

possession until a judge could rule on the merits of the Complaint.  The Plaintiff exhibited an ulterior motive by using the threat of the Order of Attachment and TRO to secure payment from the Defendants, even if payment was taken in an "attempt to settle" the claims between the parties.

64.    The Plaintiff circumvented any judicial determination of the exact amount owed and any opportunity for the Defendants to assert affirmative defenses to the Plaintiff's claims.  In other words, the Plaintiff willfully used the ancillary remedies of the Order of Attachment and TRO to gain an improper advantage to collect far more than what was owed.  That action was an abuse of process, and this impropriety taints the entire ancillary proceeding.

65.    The Plaintiff asserts as defenses to the abuse of process claim that the Noerr-Pennington Doctrine and First Amendment protect the Plaintiff from liability.  The Noerr-Pennington Doctrine generally "provides that a party who seeks redress by filing a lawsuit is immune from claims that are based solely on the pursuit of that lawsuit." [27] *Velocity Solutions, Inc. v. BSG Fin., LLC*, 2016 NCBC 19, 52 (N.C. Super. Ct. 2016) (citing *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139 (1961)).  The First Amendment protects the right "to petition the Government for a redress of grievances." U.S. Const. amend. I.  Both of these defenses focus on the initiation and legitimate continuation of process, rather than the subsequent misuse of process, and do not protect the Plaintiff.  The Plaintiff did not pursue its causes of action as contemplated by the Order of Attachment and TRO.  Using the pre-judgment remedies that should only be used in specific situations, the Plaintiff sought to collect its debt, and one it had

---

[27] The "Noerr-Pennington Doctrine" emerged in the antitrust context, but courts have entertained the Doctrine as a defense to North Carolina state law claims. *See, e.g. The Biltmore Co. v. Nu U, Inc.*, 2016 U.S. Dist. LEXIS 180369, at *10 (W.D.N.C. Dec. 30, 2016) ("North Carolina courts have adopted the principles of the Noerr-Pennington doctrine in the context of Chapter 75 claims, holding that bringing a lawsuit which is objectively reasonable cannot constitute an unfair trade practice under Chapter 75.")

previously neglected, by attempting to attach the Defendants' property. The Plaintiff cannot use the Noerr-Pennington Doctrine and First Amendment as a shield under those circumstances.

66.     Finding that the Plaintiff abused process, the court must determine what damages are warranted.  The court is not convinced the auction sales suffered as a result of the Plaintiff's presence with Deputy Broughton on Holmes' property the day before the auction.  Actually, the presence of law enforcement in almost any setting provides a sense of safety, and the court is unable to find a correlation between the events of March 16, 2012 and the auction's success (or failure) the following day.  The court finds, however, that equity requires the Defendants be permitted to assert any affirmative defense that might otherwise be precluded by the Defendants' payment that stemmed from the Plaintiff's abuse of process.  Specifically, the court will allow the Defendants to assert the statute of limitations defense against the breach of contract claim.  Ordinarily, a party would be precluded from asserting that a debt was beyond the statute of limitations after paying the debt in full, but because the Plaintiff committed abuse of process in obtaining payment, the Defendants will be permitted to assert that defense and will not be found to have reaffirmed or agreed to any modification of the debt outside the statute of limitations.  The Plaintiff's defense of "reaffirmation of debt" fails.

67.     The Plaintiff's affirmative defenses of accord and satisfaction and release and waiver likewise fail, because they assert generally that upon payment to the Plaintiff on March 16, 2012, the Defendants waived or lost the right to assert any claim against the Plaintiff.  The Plaintiff's abusive use of the Order of Attachment and TRO must not preclude the Defendants from asserting claims against the Plaintiff and defenses to the Complaint which they otherwise could have asserted, but for the Plaintiff's circumvention of the judicial process to obtain payment. The court will now address each of the Defendants' defenses to the breach of contract claim.

<u>Defendants' Affirmative Defenses to Plaintiff's Breach of Contract Claim</u>

*Failure to Meet Conditions Precedent*

68.    "A condition precedent is a fact or event that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty." *Mosely v. WAM, Inc.*, 606 S.E.2d 140, 144 (N.C. Ct. App. 2004) (citing *Cox v. Funk*, 255 S.E.2d 600, 601 (N.C. Ct. App. 1979)).  In the MTD and Counterclaim, the Defendants assert the "Plaintiff has failed to meet conditions precedent to recovery . . ." without identifying what condition precedent was present in the agreement between the parties.

69.    "Conditions precedent are not favored by the law.  Thus, the provisions of a contract will not be construed as conditions precedent in the absence of language clearly requiring such construction." *Mosely*, 606 S.E.2d at 144 (citing *Craftique, Inc. v. Stevens & Co., Inc.*, 364 S.E.2d 129, 131 (N.C. 1988); *In re Foreclosure of Goforth Props., Inc.*, 432 S.E.2d 855, 859 (N.C. 1993)). The Complaint does not allege that the Plaintiff has complied with all conditions precedent to the Defendants' liability under the agreement between the parties; however, "[o]nly when the contract sued upon contains some condition precedent to defendant's liability thereunder is it necessary for plaintiff to plead performance . . . ." *Beachboard v. Southern R. Co.*, 193 S.E.2d 577, 584 (N.C. Ct. App. 1972) (citation omitted).

70.    Moreover, the "denial of performance or occurrence shall be made specifically and with particularity." N.C. Gen. Stat. § 1A-1, Rule 9(c) (2011); *see Spencer Oil Co. v. Welborn*, 202 S.E.2d 618, 621 (N.C. Ct. App. 1974) ("It seems that where a party intends to rely upon the failure of the occurrence of a necessary condition, it should be specially pleaded in the answer.").  The Defendants have not identified any condition precedent in the agreement between the parties, and

the Defendants' general denial that conditions precedent were met is insufficient to defeat the Plaintiff's breach of contract claim.

*Waiver and Estoppel*

71.     The MTD and Counterclaim states that "Plaintiff's claims are barred by the several doctrines of estoppel" and "Defendant alleges [sic] waiver as a defense to Plaintiff's allegations." "Waiver and estoppel are affirmative defenses which must be pled with certainty and particularity and established by the greater weight of the evidence." *Duke University v. St. Paul Mercury Ins. Co.*, 384 S.E.2d 36, 42 (N.C. Ct. App. 1989) (citing N.C. Gen. Stat. § 1A-1, Rule 8(c) (2014); *Rivenbark v. Moore*, 291 S.E.2d 293 (N.C. Ct. App. 1982)).  The Defendants' vague reference to "the several doctrines of estoppel" is not the model of a particularly pled defense, but the court will nevertheless address both defenses to explain why they have no merit.

72.     Presumably, these two defenses are asserted to argue that by failing to collect payments from the Defendants after April 13, 2006, the Plaintiff waived its right to collect and should be estopped from claiming breach of contract. "The essential elements of waiver are (1) the existence, at the time of the alleged waiver, of a right, advantage or benefit; (2) the knowledge, actual or constructive, of the existence thereof; and (3) an intention to relinquish such right, advantage or benefit." *Demeritt v. Springsteed*, 693 S.E.2d 719, 721 (N.C. Ct. App. 2010) (quoting *Fetner v. Granite Works*, 111 S.E.2d 324, 328 (N.C. 1959)).

73.     Estoppel generally is based on the principle that the "promisee in reliance upon the promise has been placed in a changed condition or position where detriment could only be avoided by enforcement of the promise." *Clement v. Clement*, 55 S.E.2d 459, 461 (N.C. 1949).  A defendant asserting promissory estoppel to show the plaintiff waived a contractual right "need not prove all elements of an *equitable* estoppel, for which proof of actual misrepresentation is essential . . . .

Rather, he need only prove an express or implied promise by [the plaintiff] to waive the [contractual] provision and defendant's detrimental reliance on that promise." *Wachovia Bank & Trust Co., N. A. v. Rubish*, 293 S.E.2d 749, 756 (N.C. 1982) (emphasis in original).

74.    Although the court is stunned by the Plaintiff's failure to monitor its accounts receivable, Mills certainly did not intend to waive the Plaintiff's right to payment under the contract.  The Defendants, while possibly perplexed, could not have reasonably concluded the Plaintiff waived its right to payment under the agreement; therefore, the Plaintiff is not estopped from asserting the breach of contract claim.

*Payment*

75.    As noted above, the court finds Holmes' testimony that he paid to the Plaintiff over $100,000.00 in cash in a bag completely incredible.  "[T]he general rule is that the burden of showing payment must be assumed by the party interposing it." *Auto Finance Co. v. McDonald*, 105 S.E.2d 193, 194 (N.C. 1958) (quoting *White v. Logan*, 83 S.E.2d 892 (N.C. 1954)).  The Defendants' defense of payment has no merit.

*Statute of Frauds*

76.    Holmes never signed any document that specified the terms of sale upon which the parties ultimately agreed, and the Defendants assert recovery is precluded by what is commonly known as the "Statute of Frauds."  Codified in N.C. Gen. Stat. § 25-2-201, the Statute of Frauds generally requires that in order for a contract for the sale of goods over $500.00 to be "enforceable by way of action or defense," it must be in writing and "signed by the party against whom enforcement is sought . . . ."  N.C. Gen. Stat. § 25-2-201(1) (1965).

77.    A contract that does not comply with the requirements of N.C. Gen. Stat. § 25-2-201(1) "but which is valid in other respects is enforceable . . . with respect to goods for which

payment has been made and accepted or which have been received and accepted." N.C. Gen. Stat. § 25-2-201(3)(c) (1965). The parties do not dispute that the Plaintiff delivered to Holmes Agribiz, and Holmes Agribiz accepted, the Tractors and Equipment. The Defendants highlight the language "which is valid in other respects" and assert that N.C. Gen. Stat. § 25-2-201(3)(c) does not apply because there was never a meeting of the minds between Mills and Holmes regarding the terms of the sale. The court has already found there was a meeting of the minds on three separate occasions, culminating in the Second Amended Agreement. The Statute of Frauds, as codified in N.C. Gen. Stat. § 25-2-201, does not preclude enforcement by the Plaintiff of the Second Amended Agreement for the purchase of the Tractors and Equipment.

*Statute of Limitations*

78.     "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." N.C. Gen. Stat. § 25-2-725(1) (1967). The Plaintiff argues the statute of limitations did not begin running until the date the final payment was due under the agreement, or in the alternative, that the Defendants' failure to pay each installment began the tolling of the statute of limitations for that missed payment.

79.     The statute of limitations applied to installments is generally treated as follows:

> in the case of an obligation payable by installments . . . the statute of limitations runs against each installment individually from the time it becomes due, unless the creditor exercises a contractual option to accelerate the debt, in which case the statute begins to run from the date the acceleration clause is invoked.

*United States Leasing Corp. v. Everett, Creech, Hancock & Herzig*, 363 S.E.2d 665, 669 (N.C. Ct. App. 1988) (citation omitted). The exception to this rule is that for contracts containing a provision that any unpaid balance is due on the final day of the contract, the statute of limitations does not begin to run until the date the last installment is due. *Vreede v. Koch*, 380 S.E.2d 615, 618 (N.C. Ct. App. 1989).

80.    The agreement between the parties is not an "installment contract" under N.C. Gen. Stat. § 25-2-612(1);[28] however, "authorities have treated agreements falling outside of this definition as installment contracts for statute of limitations purposes." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 2015 NCBC 61, 21 (N.C. Super. Ct. 2015); *see MedCap Corp. v. Betsy Johnson Health Care Sys.*, 16 Fed. Appx. 180, 184 (4th Cir. 2001) ("*Everett* concerned a lease of office equipment which was apparently delivered in one shipment. Despite the lack of multiple deliveries, the *Everett* court did not hesitate to apply the general rule even though the controversy surrounded only the installment payments." (citation omitted)); *Stack v. Abbott Labs., Inc.*, 2016 U.S. Dist. LEXIS 114196, at *19 (M.D.N.C. Aug. 24, 2016) (holding that the general rule set forth in *Everett* applies to contracts under which payments are made in installments)).

81.    In this case, although Mills claims he contacted Holmes multiple times asking for payment between April 13, 2006 and March 16, 2012, those telephone calls cannot constitute acceleration of the payments due under the agreement. "The exercise of the option to accelerate maturity of a note should be in a manner so clear and unequivocal as to leave no doubt as to the holder's intention." *Vreede*, 380 S.E.2d at 617 (quoting 11 Am. Jur. 2d *Bills & Notes* § 296 at 321 (1963)).

82.    The Plaintiff has shown no evidence the parties agreed that any unpaid balance would be due along with the contemplated final payment. *Everett* applies to the facts of this case, and the Plaintiff's breach of contract claim is barred by the statute of limitations for any installments due prior to March 16, 2008 (four years before the Plaintiff filed the Complaint). The

---

[28] "An 'installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent." N.C. Gen. Stat. § 25-2-612(1) (1965). The agreement also does not fall under the Retail Installment Sales Act, in that a consumer credit sale cannot involve financing above $75,000.00." N.C. Gen. Stat. § 25A-2(a)(5) (2005).

April, 2007 installments due on the Tractors and Equipment, totaling $30,421.71, are barred from recovery by the Plaintiff.

*Duress*

83.     The Defendants do not explain how duress is a defense to the breach of contract claim. They have presented no evidence before the court that Mills threatened any wrongful act against Holmes in order to induce him to enter into the agreements as they evolved, and no evidence exists that the terms of the Second Amended Agreement are unfair. Nor is there evidence that Mills acted with the "corrupt intent to coerce a transaction grossly unfair to" the Defendants prior to filing the Complaint. *Link v. Link*, 179 S.E.2d 697, 705 (N.C. 1971).

84.     If the Defendants assert that they paid the Plaintiff on March 16, 2012 under duress, that argument is irrelevant to the breach of contract claim filed before those events occurred. The court's ruling on the abuse of process claim addresses the manner in which the Plaintiff collected payment, and the defense of duress fails. Having addressed each of the Defendants' defenses to the breach of contract claim, as well as Defendants' abuse of process counterclaim, the court now addresses the Defendants' counterclaims of conversion and violations of the NCDCA.

Defendants' Remaining Counterclaims Against the Plaintiff

*Conversion*

85.     In North Carolina, conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Peed v. Burleson's, Inc.*, 94 S.E.2d 351, 353 (N.C. 1956)). The "two essential elements of a conversion claim [are] ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc.*

*v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 747 (N.C. 2012) (citing *Gadson v. Toney*, 316 S.E.2d 320, 321-22 (N.C. Ct. App. 1984)).

86.     Defendants' claim for conversion fails on the grounds that the Plaintiff never took possession of the Tractors and Equipment.  The Defendants assert that when the Plaintiff accepted the check from Harris, the Plaintiff took wrongful possession of proceeds to which the Defendants were entitled.  The Defendants' argument requires the court to take multiple leaps that the court is unwilling to take.  Harris paid the Plaintiff before the proceeds of the Tractors and Equipment were in existence, with the understanding Defendants would reimburse Harris out of the auction proceeds.  Although the Defendants intended that Harris would be paid from the sale of the Tractors and Equipment, the funds that were paid to the Plaintiff are too far removed from the proceeds of the Tractors and Equipment – and even more so from the Tractors and Equipment themselves – for  the court to find the Plaintiff liable for conversion.

*Violations of the NCDCA*

87.     "[B]efore a claim for unfair debt collection can be substantiated, three threshold determinations must be satisfied.  First, the obligation owed must be a 'debt'; second, the one owing the obligation must be a 'consumer'; and third, the one trying to collect the obligation must be a 'debt collector.'" *Green Tree Servicing LLC v. Locklear*, 763 S.E.2d 523, 527 (N.C. Ct. App. 2014) (citing *Reid v. Ayers*, 531 S.E.2d 231, 233 (N.C. Ct. App. 2000); N.C. Gen. Stat. § 75-50(1)-(3) (2015)).  "'Consumer' means *any natural person* who has incurred a debt or alleged debt for personal, family, household or agricultural purposes." N.C. Gen. Stat. § 75-50(1) (2015) (emphasis added).

88.   Holmes Agribiz, the purchaser of the Tractors and Equipment, cannot qualify as a consumer under the NCDCA.[29]  The Defendants' counterclaim alleging violations of the NCDCA must be dismissed.  Similarly, the Defendants' request that attorney's fees be awarded pursuant to N.C. Gen. Stat. § 75-16.1 must also be denied.  ("In any suit instituted *by a person* who alleges that the defendant violated G.S. 75-1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party . . . ."). N.C. Gen. Stat. § 75-16.1 (1983) (emphasis added).

### Final Tally of Amounts Owed Between the Parties

89.   As stated earlier, the missed installment payments under the Second Amended Agreement total $143,936.88.  If the April, 2007 installments totaling $30,421.71 are subtracted from this amount, based upon the finding that they were beyond the statute of limitations when the Plaintiff filed the Complaint, the balance owed to the Plaintiff on March 16, 2012 was $113,515.17. The Defendants overpaid the Plaintiff by $108,984.83 on March 16, 2012, and the Defendants should be repaid with interest at eight percent, which is the legal rate of interest in North Carolina. N.C. Gen. Stat. § 24-1.[30]  The amount of interest on those funds is $8,145.50 for a period of 341 days at the legal rate until the Plaintiff partially repaid the overpayment when it remitted $96,000.00 to the Defendants on February 20, 2013.  That amount should be credited accordingly, but the Defendants should continue to receive interest on the balance up to the date the Plaintiff filed its Chapter 11 petition on February 20, 2015.  After the payment of $96,000.00 is applied toward the overpayment (including the interest that accrued from March 16, 2012 to February 20,

---

[29] At the Trial, counsel for the Defendants asserted the Plaintiff admitted Holmes Agribiz qualified as a consumer during the discovery proceedings in the Removed Action; even if the Plaintiff made such an admission, Holmes Agribiz cannot qualify as a consumer under the plain language of N.C. Gen. Stat. § 75-50(1).

[30] While the interest rate on federal judgments is based on the Treasury yield under 28 U.S.C. § 1961, the determination of interest in this matter should be based upon the applicable rate of the state whose law should be applied.  The parties, the transaction and the legal action taken in this matter are all within the state of North Carolina.

2013), a principal balance of $21,130.33 remained.  That balance accrued interest in the amount of $3,380.85, based upon 730 days at the legal rate from February 20, 2013 until February 20, 2015.  The Plaintiff owed to the Defendants a total of $24,511.18 as of February 20, 2015; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1.      The Plaintiff's breach of contract claim is allowed in part and denied in part;

2.      The Defendants' abuse of process claim is allowed;

3.      The Defendants' claims of conversion and violations of the NCDCA are denied;

4.      The Defendants shall have a claim against the Plaintiff in the amount of $24,511.18, and a separate judgment in this amount shall be entered in this adversary proceeding pursuant to Rule 58(a) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7058 of the Federal Rules of Bankruptcy Procedure; and

5.      For purposes of the administration of the Plaintiff's bankruptcy estate, any additional claims asserted against the Plaintiff by the Defendants and L&W are disallowed.


END OF DOCUMENT